[Cite as *In re B.S.*, 2016-Ohio-5811.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: B.S.
     L.S.

C.A. No.     28198

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 14-09-598
                DN 14-09-599

DECISION AND JOURNAL ENTRY

Dated: September 14, 2016

CARR, Presiding Judge.

{¶1} Appellant, Janet M., appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her two minor children and placed them in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

{¶2} Janet M. ("Mother") is the mother of B.S., born February 18, 2001, and L.S., born June 26, 2004. In 2014, when this case began, Mother was married to David M. ("Stepfather"). The father of the children, Lonnie S. ("Father"), has not appealed from the judgment of the trial court.

{¶3} According to the complaint, CSB initially became involved with the family through an "Alternative Response case" from April to July 2014. At that time, the agency investigated reports that B.S. had multiple marks on his arms, with a concern that the marks

might be cigarette burns. The marks turned out to be eczema and/or bed bug bites that B.S. had scratched. There were also concerns that B.S. exhibited sexualized behaviors and language at school. He was referred for a sexual risk evaluation at Ohio Guidestone, which showed that B.S. was at risk to offend, but Mother did not follow through with the recommended counseling for him.

{¶4} CSB became involved with the family again when, on September 11, 2014, L.S. told a teacher that B.S. attempted to hang himself. The school contacted Mother and advised her to seek medical/mental health assistance for B.S. Mother took him to Child Guidance and Family Solutions for crisis intervention. At the initial appointment, Mother claimed B.S.'s attempt to harm himself was an effort to seek attention and she did not believe it was important that he attend counseling.

{¶5} CSB, police, and paramedics responded to the home later that same day. B.S. denied being actively suicidal at the time, but admitted that he had tried to harm himself several times before, had homicidal ideations regarding a school mate, and had sexually abused L.S. several times, including fondling and penetration, most recently just two days before. Mother acknowledged that she knew about the inappropriate sexual behavior and stated that she has had the boys alternate sleeping on the couch because they share a bedroom.

{¶6} CSB took L.S. to Akron Children's Hospital for evaluation. There, L.S. reported that he saw B.S. try to hang himself and that B.S. had kissed, fondled, and penetrated him. Following the evaluation and pursuant to a safety plan, L.S. was placed in the home of his paternal grandmother. Mother did not agree with that placement and wanted to keep both boys in her care. Within a week, L.S. was back at Mother's home where B.S. still resided. Mother later testified that, upon consultation with a lawyer, she believed she could retrieve L.S. because

there was no court order. Mother said she stayed awake all night to ensure that the boys slept in separate rooms.

{¶7} On September 18, 2014, CSB filed complaints in juvenile court, alleging that B.S. was neglected and dependent, and that L.S. was abused, neglected, and dependent. The trial court granted emergency temporary custody of B.S. to CSB, and the agency placed B.S. at Guidestone for a residential evaluation. L.S. was allowed to remain in Mother's custody under an order of protective supervision with CSB. At the adjudicatory hearing, the parents stipulated to the allegations in the complaint and the trial court entered adjudicatory findings consistent with the complaint.

{¶8} L.S. was seen at the Care Center of Akron Children's Hospital to further evaluate the concerns of sexual abuse. It was difficult to understand the child because of a developmental delay, but L.S. was able to communicate that something happened with his brother and with his backside. He also communicated that he "got F'd," but could not explain what that meant or provide details. The Care Center recommended continued trauma therapy, believing that would provide an opportunity for L.S. to build a relationship with a counselor and better explain what happened. L.S. and Mother met with a trauma therapist eight times, but L.S. made little progress. According to the therapist, L.S. refused to engage and became destructive with the materials. The therapist opined that L.S. may have been cognitively unable to benefit from the type of therapy that she was able to offer in the office and recommended intensive home-based therapy instead.

{¶9} At the dispositional hearing in December 2014, the parents agreed to maintain the same custodial arrangements, and the trial court so ordered. The trial court also adopted a case plan. According to the case plan, B.S. was to complete a residential treatment program, which

included individual, group, and family therapy. L.S. was to participate in counseling to address sexual abuse issues. Adult family members were to provide appropriate supervision of L.S. to ensure he was no longer victimized. Mother and Stepfather were to participate in parenting education to learn strategies for parenting both victims and perpetrators of sexual abuse. Mother, Stepfather, and Father were to participate in family therapy with each child when determined to be appropriate by their therapists. Stepfather was to complete a substance abuse evaluation to address concerns of alcohol use. Father was to address anxiety and substance abuse issues through counseling and random drug screens. Finally, Mother, Father, and Stepfather were offered weekly visitation with B.S. at Guidestone.

{¶10} Over the course of time, several amendments were made to the case plan. Father's requirement for drug screens was removed following several negative test results, but a similar requirement was added for Mother when concerns arose that Mother was using L.S.'s prescription medication and marijuana. In addition, upon receiving reports that family members were having inappropriate discussions with B.S., his visits and telephone calls were required to be supervised.

{¶11} In April 2015, CSB moved to change the custodial disposition of L.S. from Mother to CSB, based on L.S.'s poor school attendance and significant behavioral issues, Mother's failure to keep appointments for CSB's home visits and with L.S.'s service providers, Father's failure to engage in counseling or parenting classes, and the fact that the family was about to be evicted from their apartment. Shortly after the motion to change custody was filed, Mother, Stepfather, and L.S. moved to Sandusky. CSB requested that the trial court refrain from ruling on the motion to change custody until CSB was able to investigate the new residence of the family.

{¶12} On May 18, 2015, the CSB caseworker and L.S.'s guardian ad litem met with the family in Sandusky, where they discovered that the family of three was staying at the two-bedroom apartment of a friend and his adult son. The caseworker was concerned that L.S. was sharing a bedroom with the 21-year old son, although Mother claimed the 21-year-old was seldom there. L.S. had been enrolled in a local school, but was removed after half a day for disruptive and disrespectful behavior. Mother met with school officials the following day, and arrangements were made for L.S. to work with a volunteer teacher at the local library for an hour daily for the last few weeks of the school year. It was anticipated that L.S. would return to regular school in the fall.

{¶13} Mother had not given CSB any advance notice that she was moving out of the area, but later explained that she and her husband had been unable to find employment in Akron, and they thought Sandusky would provide them with a fresh start. They did, in fact, find employment in Sandusky, and they were in the process of buying a car from the friend with whom they were staying. Mother promised better compliance with the visitation schedule going forward because of the car and insisted that her employer is a very understanding person who would accommodate visits.

{¶14} After CSB's home visit and a hearing on the motion to change custody, CSB was granted temporary custody of L.S. and the agency placed him in residential treatment at Beech Brook. The case plan was amended to include parental visitation at Beech Brook, as well as the attainment of stable housing by both parents.

{¶15} In October 2015, the caseworker was concerned that the case was "going nowhere" and scheduled a meeting for the parents, their attorneys, the children's guardians ad

litem, the CSB supervisor, and the CSB attorney. The attorneys and guardians ad litem came, but neither parent attended.

{¶16} On October 19, 2015, CSB filed a motion for permanent custody. Following a hearing, the trial court granted permanent custody to CSB and terminated the parents' parental rights to B.S. and L.S. Mother appeals and assigns one error for review.

II.

**ASSIGNMENT OF ERROR**

THE STATE FAILED TO PRESENT CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN PURSUANT TO [R.C. 2151.414(D)].

{¶17} Mother contends the trial court erred in finding that permanent custody was in the best interest of the children, as required for satisfaction of the second prong of the permanent custody test. *See* R.C. 2151.414(B)(1) and R.C. 2151.414(D)(1). Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test, as required under R.C. 2151.414(B). The trial court must find: (1) the existence of one of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e), and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). *See* R.C. 2151.414(B)(1) and R.C. 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶18} The trial court found that the first prong of the permanent custody test was satisfied because the children could not be returned to either parent within a reasonable period of

time or should not be returned to their care. *See* R.C. 2151.414(B)(1)(a). Mother has not challenged the first prong finding by the trial court, but rather only challenges the second prong best interest finding on appeal.

{¶19} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider all relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, the children's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(D)(1)(a)-(e). "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

### 1. Interactions and interrelationships of the children

#### B.S.

{¶20} This court case began with concerns that thirteen-year-old B.S. had sexually abused his ten-year-old brother. B.S. admitted offending against his brother and having an attraction to younger children. He also disclosed that he had been a victim of sexual abuse himself - by an unknown perpetrator. Although Mother admitted she was aware of the problem with her sons, she did not seek outside help until authorities became involved. Instead, she sought to deal with the situation herself and denied the need for counseling. The caseworker testified that Mother has acknowledged that B.S. offended against L.S., while Father has continued to deny it.

{¶21} At Guidestone, B.S. was enrolled in individual, family, and group counseling as well as medication management with a psychiatrist. The case manager from Guidestone explained that over the course of 16 months B.S. had made "some progress. It kind of was back and forth, up and down," but he was thought to be ready to step down to a group home on February 1, 2016. She said B.S. was attending school and taking his medication regularly. He was learning to interact with children his own age and developing friendships. The case manager said that B.S. was exhibiting less physical aggression, but could still be disrespectful and refuse to follow staff directions. He did not like to do chores and needed a lot of prompts to engage in personal hygiene matters. He did not typically talk much about his family.

{¶22} Upon receiving reports that family members shared inappropriate information with B.S., CSB required future visits at Guidestone to be supervised. Family members allegedly told B.S. that he did nothing wrong, did not need to be at Guidestone, and did not have any behavior problems. There was no evidence that the information came from Mother. According to his guardian ad litem, such information was having a negative impact on B.S.'s behavior and was slowing his progress. The CSB caseworker believes that B.S. now accepts what he needs to work on, especially since Father had ceased contact. Services providers stated that B.S. will require caregivers that are patient and understanding going forward.

L.S.

{¶23} While L.S. was still residing in Mother's home, the CSB caseworker became concerned with the excessive amount of school he was missing and with Mother's failure to keep service appointments for him. These failings had an impact on L.S. During the last year L.S. resided with Mother, he was enrolled in at least four different schools and was removed from three of them for behavioral problems. At the fourth school, the Findley Community Learning

Center, L.S. attended only 18 days of school over the course of two months before Mother withdrew him to move to Sandusky. The principal of that school testified at the permanent custody hearing and explained that L.S. has "pretty intensive needs for education." She explained that every time L.S. returned to school after missing a day, he had to retransition, requiring him to spend time in the office conference room with the principal and assistants to socialize him back to classroom behavior. Sometimes this took several hours. The principal said that there was good communication between the school and Mother, and she has always been receptive. Nevertheless, despite frequent efforts by the school to emphasize the importance of consistency in attendance, L.S.'s attendance was very poor. For her part, Mother insisted that L.S.'s attendance was excellent until CSB became involved with the family.

{¶24} Additionally, Mother's failure to keep a follow-up appointment with the pediatric psychiatrist who managed L.S.'s medications resulted in an inability to obtain a refill on a 30-day prescription for his Attention Deficit Hyperactivity Disorder ("ADHD") medication. Mother claimed she obtained two seven-day refills from hospital emergency rooms, but the caseworker nevertheless asserted that L.S. was without prescribed medication for a period of time.

{¶25} Upon entering residential treatment at Beech Brook, L.S. presented as very angry and depressed. His cognitive disability inhibited his ability to verbalize and caused him to act out in a negative way. It also meant that talk therapy did not work well with him, so therapists utilized play, sand tray, art, and music therapy. During his first four months at Beech Brook, L.S. made moderate progress, described as a decrease in defiant oppositional behavior and an improved ability to participate in a classroom setting. During this period, Father visited him six times and Mother visited him twice. At that point, Beech Brook recommended that L.S. be given a community placement and CSB located a foster home for him. It did not go well, however.

L.S. struggled with following directions from the foster mother, isolated himself, and repeatedly ran away. After two weeks, he was returned to Beech Brook.

{¶26} During L.S.'s second admission at Beech Brook, therapists worked on processing his trauma. During those five months, L.S. had no visits from either parent. L.S. spoke of feelings of sadness and expressed hopelessness about his inability to control his environment and still being in Beech Brook. He interacted pretty well with children his own age, but tended to isolate himself. The agency was working on a plan to move him to an open unit, with more exposure off-grounds, as a means to keep him motivated and not feeling as hopeless.

{¶27} Upon being asked by L.S.'s attorney to describe some of the positive things L.S. has done, the Beech Brook case manager described L.S. as being creative, having a great sense of humor, doing much better in school, and being very interested in electronics and game systems. She stressed that consistency in attending school was very important to L.S. as with all of their children. Beech Brook's policy is that "you can't just bounce out of school. If you take a break, we encourage you and we have things put in place that help you get back in the classroom. So there is not really an option of whether or not you go to school, you have to go to school." She explained that L.S. now also comes to therapy willingly, and is "kind of vested" in the process so that she believes he will be able to continue on an outpatient basis. She emphasized that it is important that his environment is extremely structured. His future caregiver must understand his mental health needs and have tools and techniques to assist him. The case manager testified that with structure, L.S. has "come out of his shell" and feels safer and more secure.

{¶28} Along the way, L.S. has received diagnoses of Oppositional Defiant Disorder, Post-Traumatic Stress Disorder, mood disorder NOS, ADHD, and mild mental retardation.[1] He was determined to be eligible for services from the Board of Developmental Disabilities. His guardian ad litem observed that he had difficulty telling time, counting money, reading, spelling and writing.

{¶29} Early on, L.C.'s therapist believed that Mother and L.S. were bonded. She said that Mother loved L.S., and that she was very important to L.S. The Beech Brook case manager said that L.S. used to say that he was going to run away to his Father and seemed to indicate that he missed having contact with Father, but he has not said that in a long time.

Parents

{¶30} The record demonstrates a lack of effort by both parents to comply with their case plan obligations. Neither parent has demonstrated that he or she can provide appropriate care for the children. Father has not obtained housing, failed to engage in any individual counseling services, and did not even attend the permanent custody hearing. For her part, Mother did not attend any parenting classes, did no drug tests, and has not established stable housing. Throughout the case, Mother failed to take responsibility for the fact that she had failed to consistently maintain L.S. in school, in counseling, or provide him with his medication.

{¶31} The parents had an opportunity to learn how to parent these children through participation in family therapy sessions while they were in residential treatment. Father attended

---

[1] Because the record uses the term "mentally retarded," the Court includes it here. We note, however, that the Ohio General Assembly has recently determined to substitute the term "intellectual disability" for references to "mental retardation" in the Ohio Revised Code, effective October 12, 2016. *See* Sub. H.B. 158, 2016 Ohio Laws File 122. *See also Hall v. Florida,* —— U.S. ——, 134 S.Ct. 1986, 1990 (2014) in which the United States Supreme Court has chosen to make a similar substitution.

five sessions with B.S. Mother attended none with B.S. There is no evidence that either parent attended any therapy sessions with L.S.

{¶32} Significantly, the parents did not maintain regular contact with the children through visitations. Mother visited B.S. 12 times, and only once in the last seven months. Father visited him 24 times in total, and only once in the last six months. Mother visited L.S. twice and Father visited him six times overall. Neither parent visited L.S. during the last five months. Nor have the parents maintained telephone contact with the boys. Mother claimed that she could not negotiate the evening voice mail directions at the facilities, and was not able to call during business hours. She claimed that she had to do laundry and grocery shopping during the window of daytime hours when she was not working. As found by the trial court: "These excuses ring hollow and weak." At the permanent custody hearing, Mother angrily asserted that she had done nothing wrong and that the boys should be returned to her.

{¶33} Mother has failed to recognize the need for services for her children and the importance of her own participation in those services. Her failure to engage in those services and her lack of contact with her children has resulted in a lack of insight into the conditions and the very significant needs of the children. Furthermore, she has not taken responsibility for her failure to participate in services or for her lack of contact with the children.

Brothers

{¶34} There is no evidence of a positive relationship between the brothers. They have had no contact with each other since they were separated at the beginning of the case. Neither of the boys has anyone else in their lives that has nurtured a positive bond and maintained a relationship with them.

**2. Wishes of the children**

{¶35} B.S.'s guardian ad litem reported that B.S. loves both of his parents, but has a big problem in terms of Mother being with Stepfather. According to B.S., Stepfather has been very aggressive with both boys. B.S. understands that Mother loves her husband, and he did not want to interfere with that, but Mother was not his first choice for where to live. He also loves Father and respects him, but understands Father would need to have a house before he could live with him. According to the guardian ad litem, B.S. is, therefore, aware of shortcomings by both of his parents in terms of parenting ability.

{¶36} B.S.'s guardian ad litem reported that neither parent has visited B.S. recently. The guardian believed that Father became upset when his visits were required to be supervised and began visiting less. The lack of visits, in turn, upset B.S. The guardian did not know why Mother stopped visiting, and his attempts to contact her through her attorney went unanswered. The guardian ad litem said that Mother's last visit ended in a "row" between her and the Shelter Care staff because she wanted to take pictures and that was not permitted as it would violate the privacy of other clients. After that visit, B.S. reported that he did not want to see Mother any more.

{¶37} Finally, B.S.'s guardian ad litem observed that B.S. has thrived at Shelter Care, and he is very happy there. He indicated that any future environment for B.S. will have to take into account his potential for sexual behavior and his developmental disabilities. Any home will have to offer consistency, stability, love, and a steady guiding hand. He believed that neither Mother nor Father is able to provide that type of environment to B.S. B.S. has indicated that he is prepared to wait until he is 18 to live with Father. The guardian ad litem recommended that B.S. be placed in the permanent custody of the agency and that a foster family for adoption be found if possible. At the request of B.S., and without objection by the guardian ad item, the

guardian requested that occasional visits by Father be allowed because when B.S. is 18, he will "need that connection."

{¶38} When L.S.'s guardian ad litem was first assigned to the case, he detected a bond between L.S. and Mother. He said L.S. liked to spend time with Mother, walking, talking, or playing games together. Since he has been at Beech Brook, however, he has had very few visits from his parents. More recently, L.S. said: "I miss my family, but I am cool." His guardian ad litem believes that the absence of his family is affecting him more than what he says, but reintroducing the parents now could be difficult for L.S. because they have not been around while he has been addressing his trauma. The guardian ad litem believes that the absence of visitation by his parents has, in fact, created another trauma for L.S.

{¶39} The guardian ad litem reported that L.S. has said he would like to live with Father, but Father told the guardian ad litem that he would like to obtain custody of B.S. and the boys cannot be placed together. L.S. has also said that he would not want to live with Mother and Stepfather because Stepfather drinks too much and is mean.

{¶40} The guardian ad litem described L.S. as a loner, withdrawn, and not bonded with any particular relative. He is often sad, and he has anger and self-esteem issues. He has a long way to go academically to catch up. The guardian ad litem explained that the parents' progress on their case plan objectives was very limited. Stepfather has not engaged in his case plan requirements. The guardian believed that if the parents had engaged in family therapy, parenting classes, and regular visits, they would have better understood L.S., his state of mind, and his current needs. The guardian ad litem concluded by saying that L.S. is going to need a family that will remain committed to him and meet all of his needs. He will require someone willing to put

a lot of time and effort into his care. He recommended that L.S. be placed in the permanent custody of CSB and that the agency identify a foster-to-adopt home for him.

{¶41} L.S.'s attorney also addressed the court. At the beginning of the permanent custody hearing, the attorney reported that L.S. was very conflicted, scared, and confused. At the midway point, when removal from Mother's home was being considered, L.S. did not want to leave. At the close of the permanent custody hearing, the attorney expressed great sympathy for L.S. He felt that L.S. deserved "to go to school on a regular basis [and] to thrive there [and] to get the counseling that he desperately needs to move on past this trauma." He reported that L.S. does not have a strong stance as to where he wants to go. He said L.S. wants stability, to feel loved, to feel welcomed, and asked the court to find that for him.

### 3. Custodial history of the children

{¶42} Both children resided with Mother until this case began in September 2014. At that time, B.S. was placed in residential treatment at Guidestone and remained there for 16 months. He was in the sexual aggression unit throughout his stay. He was recently accepted into a less restrictive placement in a group home at Shelter Care and had been there for two months at the time of the permanent custody hearing.

{¶43} L.S. remained in the custody of Mother under the protective supervision of CSB for nine months. Based on concerns of poor school attendance and a lack of follow through by Mother on counseling, psychiatric services, and housing, the trial court granted temporary custody of L.S. to CSB. At that time, the agency placed L.S. in Beech Brook. Except for an unsuccessful two-week placement in a foster home, L.S. resided at Beech Brook for about nine months.

**4. The children's need for a legally secure permanent placement**

{¶44} The CSB caseworker testified that the agency explored family members on both sides of the family, but none were willing and able to care for the boys. The paternal grandmother expressed some interest, but eventually concluded that she could not assume care. The maternal grandfather called about visits, but was firm that he was not able to provide long-term care for the boys.

{¶45} B.S. has been in agency custody for 18 months and L.S. for nine months. During that time, both boys have been in residential treatment facilities. Neither parent has been consistent in maintaining contact with the children or in attempting compliance with the case plan. Stepfather showed little interest or effort in working on his case plan.

{¶46} At the permanent custody hearing, the caseworker explained that Mother had become very angry when L.S. was removed from her home and would call her names and make threats when she called her on the telephone. The caseworker emphasized that the parents do not have an understanding of L.S.'s needs since they have been away from him for so long. She expressed great frustration that the parents have not even called to ask about their children or to request visits for quite a while. She repeatedly sent them letters and asked them to schedule visits. She stated with frustration that she had "begged the parents to be involved, to visit their children, and neither of them will do anything that we have recommended, anything that we have asked them to do." The caseworker concluded by stating that both boys deserve consistency, stability, and support from people that love and care about them. She asserted that both boys deserve better than what they have experienced and have a right to permanency. She believes permanent custody is in the best interests of both boys.

**{¶47}** Mother has failed to demonstrate that the evidence does not clearly and convincingly establish that permanent custody was in the best interests of the children. Consequently, we conclude that the trial court did not err in terminating the parents' parental rights and in placing B.S. and L.S. in the permanent custody of CSB. Mother's assignment of error is overruled.

III.

**{¶48}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, J.
HENSAL, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

LINDA BENNETT, Guardian ad Litem.

BRIAN ASHTON, Attorney at Law, for child.